P. O. TOWNSEND et al., Plaintiffs, v. ATHELSTAN BANK et al., Defendants.

DAVID H. DYE, Intervener, Appellee, v. G. W. HOOK, Receiver, Appellant.

No. 40506.

 

·JUNE 20, 1931.

J. M. Haddock, for appellee.

Wisdom & Kirketeg, for appellant.

GRIMM, J.—No evidence was offered by the receiver. The intervener claims that on and prior to October 16, 1925, he had a checking account in the Athelstan Bank, and on said date he deposited therein the sum of $1,098.96, and being in doubt as to whether he would have sufficient funds for the purpose hereinafter stated, he then informed the cashier of said bank, one Stout, that he intended to write a check on his said account, for the sum of $780.00 in favor of one John H. Hess, whose address was Casa Grande, Arizona. It is claimed said cashier, for and on behalf of said bank, promised and agreed that the bank would pay said check when presented for payment, out of the funds so deposited; and the said fund was thereby appropriated to said purpose and became and was a

special deposit to the extent of said check, for the purpose of paying the same. The intervener had been a depositor of this bank for a considerable period of time.

There is introduced in evidence a page from the bank record showing the account of the intervener from August 12, 1925, to December 2, 1925. The record does not disclose how long prior to August 12, 1925, the intervener had been doing business with the bank.

On October 16, 1925, when the intervener made his deposit of $1,098.96, intervener's account was overdrawn $135.72. It had been overdrawn since September 29th in varying amounts. The deposit of October 16th brought the intervener's account up to $904.74. It appears that an error had crept into the bank's books, whereby the intervener had been twice given credit for an item of $128.79, and on the day of the so-called special deposit (the item of $1,098.96), the cashier of the bank demanded and received from the intervener a check payable to the bank for $128.79 to correct this error. This reduced the credit balance of the intervener to $775.95.

The intervener then drew checks, as follows:

|                 |         |
|-----------------|---------|
| October 16th    | $50.42  |
| October 17th    | 11.48   |
| October 18th    | 61.90   |
| October 19th    | 13.39   |
| October 21st    | 13.00   |
| November 7th    | 7.68    |
| November 27th   | 6.03    |
| November 28th   | 2.15    |
| November 29th   | .29.54  |

In the meantime, deposits were made, as follows:

|                 |         |
|-----------------|---------|
| October 17th    | $32.77  |
| October 20th    | 16.58   |
| November 24th   | 48.30   |
| November 25th   | 131.70  |
| December 2nd    | 184.08  |

From October 15th to November 24th, the intervener's balance at the bank varied from $667.43, the lowest, to $715.73, the highest. At the time of the so-called special deposit on October 16, 1925, the intervener claims he made a special arrangement with the bank, by the terms of which this deposit of $1,098.96

became a special deposit for the purpose of paying the check of $780.00, which the intervener then advised the cashier of the bank he was about to draw, payable to John H. Hess of Casa Grande, Arizona, and it is the contention of the intervener that this became a special deposit, impressed with a trust.

It is the claim of the intervener that, by agreement with said cashier, the correction check of $128.79 was not to be used as against this so-called special deposit. When the check from Arizona arrived in due course, payment was refused for lack of funds. Hess communicated with the intervener who immediately took the matter up with the bank. Further deposits were made and Hess was directed by intervener to forward the check for collection. This was done but the check was not paid and the bank went into the hands of a receiver on the 8th day of December, 1925.

The receiver found in the assets of the bank, cash $370.45, checks on out-of-town banks, afterwards cashed, $369.45, overdrafts of customers, afterwards collected, $459.13. He also acquired from other sources, not designated, $1,421.00. He paid out $1,024.49, leaving a balance of $1,595.52 which he, on February 9, 1926, turned over to the present receiver.

The intervener's claim was for $993.79, claiming a preference for $780.00.

The lower court found for the intervener on the question of a preference and impressed said preference on the two items, (a) the cash, (b) the amount of the out-of-town checks, but denied the preference as against the overdrafts. We are thus confronted with two main questions: First, is the intervener entitled to a preference? Second, upon what funds?

I. Is the intervener entitled to a preference? As previously stated, the receiver introduced no testimony, but contented himself with cross-examination of the witnesses offered by the intervener. They were the intervener, the original receiver and the receiver in charge at the time of the suit.

It would unduly extend this opinion to quote the entire record in reference to the deposit on October 16, 1925, of $1,098.96. It appears, without dispute, that the intervener had secured that amount of money as the proceeds of a shipment of stock to St. Joe, Missouri. The intervener testified in part as follows:

"Q. What did you do about that matter after you returned from the shipment, after you returned from your trip to St. Joe?

A. About the deposit?

Q. Yes, sir.

A. I made the deposit there and made arrangements with the bank for a check I wanted to give.

Q. Well, what check was it?

A. It is a check of $780.00.

Q. Who to?

A. J. H. Hess in Arizona.

Q. I will hand you a paper which the report has marked exhibit A. Is that the check you refer to?

A. Yes, sir.

Q. Now, who did you interview in the bank with reference to this check?

A. Mr. Stout.

Q. And what office did he hold in the bank?

A. He was cashier.

Q. And what conversation did you have with him about this check?

A. I told him that I was going to give this check for this amount and explained to him that I owed this man this amount of money and I was going to give this check and I sure wanted it paid.

Q. And what did you tell him with reference to the money you were depositing?

A. I deposited it for this purpose.

Q. And what arrangement was made with him at that time concerning the payment of the check?

A. He was to pay it.

Q. Out of what?

A. Out of the funds this money that I put in.

Q. On that day?

A. Yes, sir."

On cross-examination, he was asked this, among other questions:

"Q. Well, the facts are, are they not, Mr. Dye, that after you deposited that check for $1,098.96 you went on issuing

checks drawn on your account just the same as you had done before?

A. Not on that account. On that amount of money I went ahead checking at the bank.

Q. I will withdraw that question. I am asking you, if after you deposited that $1,098.96, if you did not continue drawing checks addressed to the Athelstan Bank and signed by you and payable to different individuals just as you had done before you made that big deposit?

A. Yes, sir.

Q. As shown by your bank book you went on making other deposits?

A. Yes, sir.

Q. After this 16th day of October just as you had before whenever you had any money to deposit?

A. Yes, sir.''

As previously stated, when the so-called special deposit was made, the cashier of the bank called intervener's attention to an error which had been made in the credits given the intervener on his deposit, amounting to $128.79. The cashier demanded a check to cover this error and the intervener gave it to him. However, the intervener testified several times that the cashier agreed and so stated that he, the cashier, ''would not use'' that correction check. It is the contention of the intervener that this correction check was to be taken out of future deposits.

Apparently, nothing was said by the parties in reference to the intervener's overdraft which existed at the time this special deposit was made. Manifestly, from the course of procedure between the intervener and the bank, the intervener was permitted to overdraw and remain overdrawn for periods of time. As previously stated, the account showed intervener overdrew in various amounts from September 29th to October 16th. The intervener was making deposits at intervals and drawing checks in the ordinary course of business, both before and after the special deposit was made.

Stout, the cashier, was not presented as a witness on behalf of either party, nor was any showing made why he was not so produced.

Intervener's testimony is not denied, except as the receiver

seeks to discredit his statements, by the numerous inconsistencies appearing in the record and by inferences to be drawn therefrom.

Notwithstanding the alleged agreement on the part of the cashier not to use the correction check, it was used, and when the Hess check arrived from Arizona, it was refused for lack of funds. Hess notified the intervener and the intervener went to the bank to ascertain what had happened. Parenthetically, it may be observed that if the correction check had not been cashed, or rather charged to the intervener's account, there would have been at all times more than $780.00, the amount of the Hess check, to the credit of the intervener. On this second occasion, the intervener transacted business with a Mr. Johnson, then President of the bank. Johnson advised him the check had not been cashed for lack of funds. When the intervener complained, Johnson said, "Oh, that is nothing. We are doing that every day, turning checks down." This conversation appears to have been on November 9th or 10th when the intervener made a deposit of $48.30 and a day or two thereafter, he made a further deposit of $131.70. The intervener called Johnson's attention to the deposit of $48.30 and said, "I have another check at home that I would have brought along had I known that" (referring to lack of funds). The intervener testified that Johnson then said, "Well, if you will send that down, then, just send it by mail, and have your check returned back, why it will be honored. Just tell them it was a mistake and for them to return the check."

Later, on December 2nd, as previously stated, the intervener deposited $184.08. Hess was notified by the intervener to collect the check. Later, Hess notified the intervener that he was unable to get his money on the check. The intervener then went to the bank and this time encountered Mr. Stout, who undertook to convince the intervener that the check had been paid. Later, on examining the record, Stout said he could find no record of the payment, and the intervener asked Stout to wire the money. The check was not paid and the bank went into the hands of a receiver.

There is no showing that the bank refused to pay the check, when it arrived the second time, but only that the check was

not paid. It was returned by the receiver and later taken up by the intervener.

It is contended that the intervener's evidence in reference to the correction check was incompetent (there being no special notation on the check) because intervener's testimony sought to vary the terms of a written instrument. The transaction, however, appears to be more in the nature of a conditional delivery of the check. That is to say, the intervener delivered the correction check on the express condition that it was not to be used out of that special fund, but to be held by the cashier to be taken up by subsequent deposits made by the intervener in the ordinary course of business.

This question of special deposits has many times been before this court. In each case, the circumstances differ somewhat from those of each of the other cases. In the case at bar, the facts are different in some respects from any other cases previously considered. A citation of authorities would be of little or no value.

Manifestly, the intervener deposited the proceeds of his sale of cattle for the special purpose of meeting the Hess check; or, stating it another way, the intervener made the deposit for the special purpose of drawing a check in favor of Hess against it. The correction check was not to be used against that fund, and as the intervener says, the other checks which he drew in the ordinary course of business for ordinary small amounts were not to be used on that special deposit. Intervener also continued to make deposits and draw checks in the ordinary course of business, as he had done prior to the time of the special deposit. Apparently, intervener's overdrafts of a few hundred dollars were not a matter of particular concern to the bank. At all events, there is no showing of any complaint on the part of the bank officers in relation thereto. On the whole record, it quite clearly appears that the intervener intended to go on transacting his business with the bank as he had previously done, making deposits and drawing checks, the bank carrying overdrafts, if any there were, and that the bank did not complain.

The proceeds of the sale of the cattle were deposited with the bank as a special deposit for the particular purpose of meeting the Hess check, and we think the trial court correctly so ruled.

Among our cases on the subject, the following may be noted: Border v. State Sav. Bk. of Dedham, 202 Iowa 27; City of New Hampton v. Leach, 201 Iowa 316; Danbury State Bank v. Leach, 201 Iowa 321; Leach v. State Savings Bank, 202 Iowa 265; Dolph v. Cross, 153 Iowa 289; Smith v. Sanborn State Bank, 147 Iowa 640; First National Bank v. Propp, 198 Iowa 809; Hanby v. First Savings Bank of Spring Hill, 197 Iowa 150; Andrew v. Security Savings Bank, 203 Iowa 546; Miller v. Andrew, 206 Iowa 957; Whitcomb v. Carpenter, 134 Iowa 227; Iowa Mutual Liability Ins. Co. v. De La Hunt, 197 Iowa 227; In re Receivership Security Savings Bank of Perry, 205 Iowa 171.

II. Upon what portion of the assets recovered by the first receiver is this preference to be applied?

It is the contention of the intervener that this preference should apply, first, to the cash in bank at the time the receiver was appointed, amounting to $370.45; second, upon the proceeds of out-of-town checks found in the bank by the receiver, amounting to $369.45; third, upon the amount collected by the receiver as overdrafts of depositors of the bank, amounting to $450.00.

As previously stated, the trial court allowed the preference to apply to the cash in bank and the proceeds of the out-of-town checks.

It will be noted that the record is silent as to the amount of cash in the vaults of the bank on the date the intervener made the so-called special deposit, nor is there any showing in the record of the amount of cash in the bank at any other time until the day the receiver was appointed, or rather when the receiver took charge of the assets of the bank.

There is no showing as to when the various so-called out-of-town checks became the property of the bank or what, if any, cash was paid for them, nor is there any showing as to when the overdrafts referred to were made by the depositors of the bank.

The question of tracing the trust funds into the assets of a bank has been recently very fully covered by this court in the case of In re Receivership American Sav. Bank of Marengo, 210 Iowa 568. Many of the principles are there collected and reannounced and the authorities in support of them have been cited. It is unnecessary at this time and in this connection to

again review them. The trust having been established, it is incumbent upon the intervener to trace the same as a trust fund into the custody of the receiver. As was said in Andrew v. Farmers Sav. Bank of Goldfield, 207 Iowa 394, and reaffirmed in In re Receivership American Sav. Bank of Marengo, 210 Iowa 568:

"He (the intervener) must go further before the receiver of the defunct institution can be compelled to turn over to him any part of the trust property. Identification of the ward's money (in this case the intervener's) is necessary, and the burden is upon appellant to trace the same as a trust fund into the custody of the receiver."

In the case at bar, the intervener presented no evidence identifying or locating the trust fund. So far as direct evidence is concerned, the trust fund is not located in the out-of-town checks or in the overdrafts of customers. There is a presumption, however, that aids the intervener. As was stated in Andrew v. Farmers Sav. Bk. of Goldfield, 207 Iowa 394, originally stated in Andrew v. State Bank of New Hampton, 205 Iowa 1064:

" 'When cash remains in the failing concern at the time it discontinued banking operations, and such money was afterwards delivered to the receiver, * * * the presumption is that said commingled fund contains "the trust proceeds", and the latter can be removed from the whole without injury or injustice to the general creditors, because there was "augmentation". Charity assumes that the trustee did no wrong, but spent and disposed of his own property, and retained that which belonged to others.' "

As was also said in In re Receivership American Sav. Bank of Marengo, 210 Iowa 568:

"Generally, said presumption previously named has been limited, in bank receivership cases, to the cash remaining in the vaults of the failing bank at the time it discontinued banking operations."

In the case at bar, the fund was to be kept intact as cash to meet a check to be drawn by the depositor, the intervener, in favor of Hess. As to the cash turned over to the receiver,

the presumption arises, if it is more than the trust fund, it contains the trust fund, or if less than the trust fund, that which remains is a part of the trust fund.

As was said in In re Receivership American Sav. Bank of Marengo, 210 Iowa 568:

"Unless the facts warrant it, application of the presumption rule will not be made to property other than cash in the bank when its doors were closed. Such is the general rule. * * * 'It is not presumed the money was converted by the bank into bills receivable, or into a deposit account with another bank, or into any other form of property.' "

Such being the rule and there being here no evidence whatever even tending to show that any portion of the intervener's funds went into either checks on outside banks or overdrafts of the bank's customers, it follows necessarily that the intervener has failed to properly trace any part of the trust fund into either of said items. It follows that the intervener is entitled to impress a trust only upon the cash remaining in the vaults of the bank at the time the bank closed and which came into the hands of the receiver, and not upon the other two items.

In accordance with our former holdings, if there are other trusts, this fund is to be pro-rated.

The finding of the lower court must, therefore, be modified, and it is so ordered.—Modified and affirmed.

ALBERT, C. J., and EVANS, MORLING, and KINDIG, JJ., concur.